IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

FILED
Scott L. Poff, Clerk
United States District Court

*By staylor at 9:15 am, Aug 21, 2018*

UNITED STATES OF AMERICA,

v.

SHAMPOIRE ORANGE,

Defendant.

CASE NO.: 5:17cr5

### ORDER and MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the Court on Defendant's Motion to Suppress Evidence Seized from Traffic Stop on May 25, 2017, as amended and supplemented. (Docs. 298, 513, 549.) The Government filed a Response and a supplement to the Response. (Docs. 378, 538.) For the reasons set forth below, I **RECOMMEND** the Court **DENY** Defendant's Motion to Suppress.

### BACKGROUND

On May 25, 2017, several law enforcement officers from the Ware County Sheriff's Office planned to execute a search warrant at the residence of Ms. Jenna Dixon in Waycross, Georgia. (Doc. 298, p. 1.) Defendant "was driving away from the property . . . at the same time as law enforcement officers were driving to that residence to execute a search warrant." (Doc. 513-1, p. 2.) These same officers, driving "unmarked vehicles[,] . . . effectuate[d] a traffic stop leading to the arrest of Mr. Orange." (Doc. 298, p. 1.)

On June 20, 2018, the Court held a Motions Hearing on various Motions filed by Defendant, (doc. 521), including the Motion to Suppress Evidence Seized from Traffic Stop on May 25, 2017, (docs. 298, 513). Defendant, Defendant's counsel, Mr. Pete Theodocion, and the Assistant United States Attorney ("AUSA"), Jennifer Kirkland, appeared at the hearing. In

presenting their arguments on the Motion to Suppress, the Government called two witnesses: Sergeant Robert Weiss and Detective James Cox of the Ware County Sheriff's Office. (Doc. 521.)

Sergeant Weiss testified that, on May 25, 2017, Ware County officers were attempting to conduct a "buy-bust operation." (June 20, 2018 Hearing Transcript, pp. 16–17 [hereinafter "June 20 Tr."].)  The officers would use a confidential informant ("CI") to purchase a quantity of methamphetamines large enough that Ms. Dixon would have to call in her supplier, and then agents could move in and apprehend the supplier.[1]  (Id.)  The CI went to Ms. Dixon's residence and was responsible for notifying Sergeant Weiss when Ms. Dixon's supplier arrived so that Weiss could "g[i]ve the order to move in."  (Id. at p. 21.)  The officers' plan was for Sergeant Weiss and Detective Cox to wait in their unmarked vehicles on either side of Ms. Dixon's home and "just kind of pin [the supplier] with our vehicles" when the supplier arrived.  (Id. at p. 19.)  Sergeant Weiss was located half a mile away and could not see the house.  (Id. at p. 32.)  Detective Cox was located a quarter to half a mile away and was using binoculars to surveil the scene.  (Id. at p. 54.)  Detective Cox could determine that there were several people in Ms. Dixon's front yard, but could not see clearly enough to determine who was on the scene.  (Id. at p. 59 ("From where I was at, I—I could see people.  I could kind of make out male or female, but I was a very long distance away.").)

The CI made contact with Ms. Dixon and made the request for a large quantity of methamphetamine, as planned.  When a maroon Volvo then arrived at Ms. Dixon's residence, the CI called Sergeant Weiss from his cellphone and said, "He just pulled up in a maroon Volvo, I think it's that target you wanted me to make a call to.  Come on."  (Def. Ex. 1, 23:52–23:59;

---

[1] Prior to the "buy-bust" operation, the Ware County officers obtained a warrant from a Ware County Magistrate Judge to search Ms. Dixon's residence.  (June 20 Tr., pp. 28–29.)  However, it is unclear if they actually intended to search the residence.

see also June 20 Tr., pp. 19–21.)[2] Detective Cox pulled in behind the Volvo and Sergeant Weiss pulled up to the corner where the house was located. (June 20 Tr., p. 21.) As Sergeant Weiss approached the corner, the maroon Volvo, later found to be driven by Defendant, "start[ed] to pull off." (Id.) Sergeant Weiss activated his emergency lights and attempted to block in the Volvo. Defendant then proceeded to go around Sergeant Weiss by driving into a ditch. In attempting to block Defendant in the ditch, Sergeant Weiss hit the driver-side, rear quarter panel. (Id.)[3] This attempt was unsuccessful and Defendant drove off, running a stop sign in the process. (Id. at pp. 21–22; Gov. Ex. 1, 15:11:21–15:11:26.)

As Sergeant Weiss turned his vehicle around, Sergeant Ray, driving a marked vehicle, took over the chase. (June 20 Tr., p. 22.) The chase proceeded for approximately three miles with Defendant blowing past several stop signs, swerving around other cars, driving on the wrong side of the road, and driving well over the posted speed limit. (Id. at pp. 22–24; Gov. Ex. 1, 15:11:21–15:12:51.) Defendant ultimately led Sergeant Ray into the rock pile yard of a concrete plant. (June 20 Tr., p. 26.) Other officers, including Sergeant Weiss, joined the chase in the rock pile yard, and after being led around for nearly two minutes, surrounded Defendant's vehicle, stopped it, and then arrested Defendant. (Id.; Gov. Ex. 1, 15:12:51–15:14:16.) During the chase in the rock pile yard, Sergeant Weiss noticed Defendant make "a motion with his right arm towards the back window." (June 20 Tr., p. 26.) While Sergeant Weiss didn't know "at the time what it was," immediately after Defendant was taken into custody, Sergeant Weiss walked back to the area and "picked up a bag of crystal-like substance which field-tested positive for

---

[2] Though the CI was wearing a wire that recorded his entire interaction with Ms. Dixon, Sergeant Weiss was parked too far from Ms. Dixon's house for the wire to transmit directly to him; the wire did, however, transmit to Detective Cox. (June 20 Tr., p. 18.) Additionally, despite his binoculars, Detective Cox could not see anybody approaching the Volvo while it was at Ms. Dixon's residence. (Id. at p. 60.)

[3] It was during this maneuver that Sergeant Weiss first recognized that the identity of the driver was Defendant Orange. (Id. at pp. 22, 37.)

3

methamphetamine." (Id.)  The officers also recovered from Defendant's vehicle: cocaine, marijuana, and the prerecorded buy money used by the CI to buy meth from Ms. Dixon. (Id.)

The Court directed the parties to file supplemental briefing on the Motion to Suppress and to specifically address: "1) at what point a seizure of Defendant occurred; 2) whether there was probable cause for a seizure and any resulting search and, if not, whether an exception applied; and 3) what standard governed any interaction between law enforcement and Defendant prior to a seizure." (Doc. 532.)  The Government filed its Supplemental Brief on July 20, 2018, and Defendant filed his on August 3, 2018.  (Docs. 538, 549.)

## DISCUSSION

The Government argues in its Supplemental Brief that the officers had reasonable suspicion to conduct a Terry stop of Defendant's vehicle based on the officers' "observations of him at Dixon's home during a drug transaction, their previous knowledge of Orange's drug dealings, and the information they received from the CI." (Doc. 538, p. 5.)  Additionally, the Government contends that the officers had probable cause to seize and arrest Defendant at the rock pile yard—and thus, the right to conduct a search incident to arrest—because Defendant ran from police, drove recklessly, violated multiple traffic laws, and threw illegal substances out the window of his car. (Id. at pp. 8–11.)  Furthermore, because the officers did not seize Defendant until he reached the rock pile yard, the Government asserts that Defendant "relinquished any legitimate expectation of privacy" to the methamphetamine he threw out of the car window. (Id. at pp. 12–13.)

Defendant, in turn, argues that the officers did not have a reasonable suspicion to conduct a Terry stop because objective facts could not show that Defendant "had engaged in, or was about to engage in, criminal activity." (Doc. 549, p. 3.)  Defendant argues that the officers

4

seized his vehicle when Sergeant Weiss hit his car and attempted to put him into the ditch. (Id. at p. 5.)  Thus, Defendant did not abandon the "allegedly tossed methamphetamines" because they were discarded "while fleeing what began as an illegal vehicle stop." (Id. at p. 6.)  Finally, Defendant concedes that the officers were justified in arresting him for the various traffic offenses committed during the chase, but the search incident to his arrest was improper because there was no indication "that Orange was able to access his vehicle at the time it was searched, and clearly none suggesting that evidence may have been inside the vehicle supporting his arrest for the traffic offenses." (Id. at p. 7.)

### I.   When Did Seizure Occur

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  A Fourth Amendment seizure occurs "when the officer, by means of physical force or show of authority, terminates or restrains [an individual's] freedom of movement through means intentionally applied."  Brendlin v. California, 551 U.S. 249, 254 (2007) (citations and quotations omitted).  However, "[a]n attempted seizure, without actual submission, is not a seizure for Fourth Amendment purposes."  United States v. Dolomon, 569 F. App'x 889, 892 (11th Cir. 2014) (per curiam) (citing California v. Hodari D., 499 U.S. 621, 626 n.2 (1991); Troupe v. Sarasota County, 419 F.3d 1160, 1167 (11th Cir. 2005)); see also County of Sacramento v. Lewis, 523 U.S. 833, 845 n.7 (1998) ("Attempted seizures of a person are beyond the scope of the Fourth Amendment." (citing Hodari D., 499 U.S. at 626 n.2, 646)).

Although Defendant argues that he was seized "once his car was rammed by Weiss" because his "freedom of movement was indeed restrained," (doc. 549, p. 5), the facts clearly indicate that what occurred at that moment was an attempted, unsuccessful seizure.  After

5

Sergeant Weiss bumped his car into Defendant's Volvo, Defendant was able to drive around Sergeant Weiss's car and lead several officers on a chase for at least another three miles. There was no "intentional *acquisition* of physical control" by the police officers. Brower v. County of Inyo, 489 U.S. 593, 596 (1989) (emphasis added); see also United States v. Jordan, 635 F.3d 1181, 1186 (11th Cir. 2011) ("When a suspect flees from the police, he is not submitting to their authority and therefore is not seized." (citing Hodari D., 499 U.S. at 626)). Indeed, video of the chase makes it quite clear that it was Defendant who led the police into the gravel yard where he was ultimately trapped—police officers did not shepherd or otherwise lead him there. While Defendant may not have had the freedom of movement he ideally desired, he was certainly not seized for Fourth Amendment purposes. See Dolomon, 569 F. App'x at 892–93 (finding no seizure where three police cars surrounded defendant's car and defendant still drove off);[4] Galas v. McKee, 801 F.2d 200, 203 (6th Cir. 1986) (defining a completed seizure as "a restraint on the individual's freedom to leave [] accomplished by means of physical force or show of authority"); cf. Brower, 489 U.S. at 597 (seizure would occur if police cruiser successfully sideswiped a car, produced a crash, and there was a "termination of the suspect's freedom of movement."). The bump neither caused Defendant to stop his car nor allowed officers to acquire physical control of Defendant. There was ultimately no "governmental *termination* of freedom of movement," id. (emphasis added), until Defendant stopped his vehicle in the gravel yard.

Moreover, the Eleventh Circuit and courts across different circuits have concluded that no seizure occurs where police attempt to stop a fleeing vehicle in more extreme manners and are ultimately unsuccessful. See Reed v. Clough, 694 F. App'x 716, 724 (11th Cir. 2017) (per

---

[4] The Court is aware that in Dolomon the police did not make impact with the defendant's vehicle. However, the Court cites Dolomon for the proposition that the police officers therein had a greater degree of physical control over defendant's vehicle (it was surrounded on three sides and stopped for a short period of time) than in the present case and the Eleventh Circuit still found that no seizure had occurred.

curiam) (finding no seizure when police shot at defendant's vehicle and defendant proceeded to drive away); United States v. Prosise, 367 F. App'x 423, 428 (4th Cir. 2010) (per curiam) (where police officer incidentally swiped defendant's vehicle during a car chase, shot defendant's side rear tire and rim four times, and defendant proceeded to drive straight into a pond and remained in vehicle for several minutes, court found that no seizure occurred until defendant walked out of the pond, waded ashore, and submitted to officers); Cole v. Bone, 993 F.2d 1328, 1333 (8th Cir. 1993) (holding that shots fired at defendant's fleeing vehicle "were not seizures because they too failed to produce a stop").

Thus, the police did not seize Defendant for Fourth Amendment purposes until they effectuated the traffic stop in the rock yard, and Defendant stopped his vehicle and submitted to the authority of Ware County police officers.[5]  The Court next examines whether the officers had probable cause to conduct that stop of Defendant's vehicle, to arrest him, and to search his vehicle.[6]

## II.     Whether Officers had Probable Cause to Arrest and Search Defendant

A traffic stop is constitutional when "the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). To determine

---

[5] The Court need not, and does not, determine whether the officers had reasonable suspicion to conduct a Terry stop of Defendant's vehicle because it has determined that the police did not seize Defendant when Sergeant Weiss unsuccessfully attempted to push Defendant's Volvo into the ditch.

[6] Because the Court has determined that Defendant was seized at the rock pile, Defendant lacks standing to challenge the methamphetamines recovered in the course of the police chase. Hodari D., 499 U.S. at 629 (holding that cocaine abandoned by suspect while fleeing from police was not the fruit of a seizure); Dolomon, 569 F. App'x at 893 ("And because [defendant] discarded the firearm before he was actually seized, thereby abandoning it, the firearm was not suppressible as the fruit of an unconstitutional seizure." (citation omitted)); United States v. Merricks, 572 F. App'x 753, 757 (11th Cir. 2014) (per curiam) ("When an individual abandons contraband during a chase with law enforcement, he has no expectation of privacy to challenge seizure of the property."); United States v. Tinoco, 304 F.3d 1088, 1117 (11th Cir. 2002) (concluding that defendants abandoned cocaine seized by the Coast Guard after crewmembers threw it into the ocean and had no standing to challenge the seizure).  Thus, the Court should **DENY** Defendant's Motion to Suppress as applied to the methamphetamines recovered at the rock pile yard and allegedly discarded during the chase.

whether probable cause or reasonable suspicion has been met, the Court must examine the officer's actions and assess whether they were reasonable. United States v. Chanthasouxat, 342 F.3d 1271, 1275 (11th Cir. 2003); see also United States v. Knights, 534 U.S. 112, 118 (2001) ("The touchstone of the Fourth Amendment is reasonableness . . . ."). This reasonableness examination is based on "objective factors, and the officers' subjective motives in making the stop are irrelevant." United States v. Rowls, 402 F. App'x 467, 468 (11th Cir. 2010) (per curiam) (citing Whren, 517 U.S. at 813). Additionally, "an officer's reasonable mistake of fact may provide the objective grounds for reasonable suspicion or probable cause required to justify a traffic stop." Chanthasouxat, 342 F.3d at 1276.

Here, there can be no question that officers had probable cause to believe that Defendant committed a traffic violation prior to their stopping his vehicle and arresting him in the rock pile yard. Defendant concedes that, prior to the interaction in the rock yard, he "drove his Volvo in violation of several traffic laws as he fled from the officers" and that the officers "were justified in arresting Orange" for these traffic offenses. (Doc. 549, p. 6.) The evidence submitted to the Court confirms this concession. Video footage from Sergeant Ray's vehicle clearly evidences Defendant's commission of multiple traffic offenses. (Gov. Ex. 1.)

Accordingly, the Court need only determine whether the officers' search of Defendant's vehicle following this lawful arrest was itself lawful. "[T]he search and seizure of vehicles without a warrant is permissible when the police have probable cause to believe a vehicle contains contraband." United States v. Virden, 488 F.3d 1317, 1321 (11th Cir. 2007) (citations omitted). Such probable cause exists when there is "a fair probability that contraband or evidence of a crime will be found." United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). Furthermore, "[i]f there is probable cause to believe

a vehicle contains evidence of criminal activity, United States v. Ross, 456 U.S. 798, 820–21 (1982), authorizes a search of any area of the vehicle in which the evidence might be found." Arizona v. Gant, 556 U.S. 332, 347 (2009).

In this case, Defendant's vehicle was seen fleeing from the house of a suspected drug dealer while said dealer was facilitating multiple drug sales.  Furthermore, Sergeant Weiss identified Defendant during the course of the chase as a prominent drug dealer himself and already under police investigation.  (June 20 Tr., pp. 20–21, 45–47.)  Finally, Sergeant Weiss saw Defendant throw an item from his window while police were chasing him in the rock pile yard.  This item field-tested positive for methamphetamine "15 or 20 seconds after" Defendant was taken into custody.  (Id. at p. 26.)  Based on this evidence alone, officers had probable cause to believe that Defendant's vehicle contained illegal substances and other "evidence of criminal activity," and therefore, had probable cause to search Defendant's vehicle incident to his arrest. Additionally, Sergeant Weiss and Detective Cox had information from the CI that Defendant arrived at Ms. Dixon's house in the middle of a "buy-bust" operation specifically designed to lure the her supplier to the house.  (June 20 Tr., p. 18.)  Moreover, the CI who was responsible for notifying Sergeant Weiss when the supplier arrived so that Weiss could "g[i]ve the order to move in" had told Weiss to "come on."  (Id. at p. 21; Def. Ex. 1.)  Thus, based on the totality of the circumstances, officers had probable cause to believe Defendant's car contained contraband.[7] For all of these reasons, the Court should **DENY** Defendant's Motion to Suppress.

---

[7] Even if the search of Defendant's car was illegal, it may be that the evidence could be admissible under the "inevitable discovery" doctrine.  Under the exception for "inevitable discovery," the government may introduce evidence that was obtained by an illegal search if it can establish a "reasonable probability that the evidence in question would have been discovered by lawful means." Jefferson v. Fountain, 382 F.3d 1286, 1296 (11th Cir. 2004); see also Utah v. Strieff, ___ U.S. ___, 136 S. Ct. 2056 (2016) ("[T]he inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source." (citing Nix v. Williams, 467 U.S. 431 (1984))).  For the doctrine to apply, the government must prove that "the lawful means which made discovery inevitable were being

9

**CONCLUSION**

For the reasons set forth above, I **RECOMMEND** that the Court **DENY** Defendant's Motion to Suppress, (doc. 298), and allow the Government to use evidence seized as a result of the May 25, 2017 traffic stop conducted on Defendant in Ware County, Georgia. The Court **ORDERS** any party seeking to object to this Report and Recommendation to file specific objections within **fourteen (14) days** of the date of this Report and Recommendation. Any objections asserting that the Magistrate Judge failed to address any contention raised in the Motions must also be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the Magistrate Judge. See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985). A copy of the objections must be served upon all other parties to the action. The filing of objections is not a proper vehicle through which to make new allegations or present additional evidence.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge. Objections not meeting the specificity requirement set out above will not be considered by a District Judge. A

---

actively pursued prior to the occurrence of the illegal conduct." Jefferson, 382 F.3d at 1296. Prior to the search of Defendant's car, the officers were already actively pursuing Defendant for the violation of numerous traffic offenses. Defendant concedes that officers had probable cause to arrest him for those offenses. There were no other occupants in Defendant's car to whom the officers could have released the vehicle. Thus, it is likely that officers would have impounded Defendant's car and conducted an inventory search as a result of that impoundment. However, the Government did not raise the inevitable discovery exception at the hearing or in its briefs, and it has the burden of proof as to the exception. See Nix, 467 U.S. at 444 n.5 (burden on prosecution to show inevitable discovery of evidence obtained by unlawful means); see also Jefferson, 382 F.3d at 1296 ("In order for evidence to qualify for admission under [the inevitable discovery doctrine] . . . the *prosecution must demonstrate* that the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." (emphasis added)); United States v. Brookins, 614 F.2d 1037, 1048 (5th Cir. 1980) ("The prosecution must bear the burden of proof on this issue [of inevitable discovery].").

10

party may not appeal a Magistrate Judge's ruling directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final judgment entered by or at the direction of a District Judge. The Court **DIRECTS** the Clerk of Court to serve a copy of this Report and Recommendation upon counsel for Defendant and the Government.

**SO ORDERED** and **REPORTED** and **RECOMMENDED**, this 21st day of August, 2018.

R. STAN BAKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA